APPEAL OF THE COLUMBIA THEATRE CO.

Docket No. 1414.   Submitted October 14, 1925.   Decided February 9, 1926.

1. Stockholders surrendered and authorized the cancellation of certain notes evidencing money advanced by them to a corporation. *Held*, that, in the circumstances of this appeal, the amount of the notes so surrendered and canceled became paid-in surplus from the date of such surrender and cancellation.

2. In response to proper corporate action stockholders paid in to a corporation certain assessments. *Held*, that such payments were additions to paid-in surplus.

3. During the period required for the construction of buildings on leased land, such construction being a condition of the lease, a corporation expended various amounts for interest, ground rents, and other expenses designated by it as carrying charges. *Held*, that such so-called carrying charges may not be included in statutory invested capital for excess-profits tax purposes.

*James P. Maginn, Esq.*, for the taxpayer.
*Arthur J. Seaton, Esq.*, for the Commissioner.

Before STERNHAGEN, LANSDON, and ARUNDELL.

This appeal is from the determination of a deficiency in income and profits taxes for the year 1919 in the amount of $4,881.20, all of which is in controversy. The taxpayer asserts that the Commissioner erred in disallowing amounts claimed as invested capital for the Mid-City Realty Co. and the Middleton Theatre Co., in computing the statutory invested capital of certain affiliated companies. The parties agree that the income tax for the year in question is correctly computed and that the appeal has to do only with profits tax.

FINDINGS OF FACT.

The taxpayer is a Missouri corporation, with its principal office in St. Louis. During the year 1918, it was affiliated, for income and profits tax purposes, with the Middleton Theatre Co., the Vaudeville Theatre Co., the Mid-City Realty Co., and the American Theatre Co., and for that year made a consolidated income and profits-tax return for itself and all other members of such affiliated group. The return so made was accepted and audited by the Commissioner.

The Mid-City Realty Co. was incorporated in 1907, under the laws of Missouri, with an authorized capitalization of $50,000, all of

which was subscribed for and paid in by nine shareholders. On September 14, 1909, the company, by appropriate corporate action, increased its authorized capitalization to $100,000, and at that date the additional $50,000 of capital stock was subscribed for and paid in by the nine shareholders. In 1909, subsequent to the increase in capital, the company borrowed $100,000 from the Mercantile Trust Co. on a fifteen-year bond issue and, as a condition of such loan, agreed to make annual payments of $3,000 on the principal of the loan during a term of fifteen years and to pay the balance in the fifteenth or sixteenth year. Such annual payments were made regularly from the funds of the company. At the beginning of the year 1918, the bonded debt had been reduced by the agreed annual payments to the amount of $76,000.

Some time in the year 1907, the Mid-City Realty Co. acquired a 99-year lease on a parcel of real estate, located at the southeast corner of the intersection of Grand Avenue and Olive Street, in St. Louis. This ground was fully improved at the time with a three-story hotel building that was rented for $15,000 per annum. A condition of the lease required the construction of a new building on the land within ten years and at a cost of not less than $150,000. To assure the fulfillment of this condition, the nine stockholders made a bond in the amount of $50,000.

In conformity with the terms of its lease, the Mid-City Realty Co. began the construction of a new building in 1909. In such construction, in reconstruction and repairs of the old building, and in annual payments on its bonded debt, it expended the following amounts: All its paid-in capital of $100,000, all the proceeds of its bond issue of $100,000, the sum of $75,000 borrowed from the Mercantile Trust Co. on the notes of the corporation, and the sum of $10,800, paid in to the company by the shareholders in response to assessments made by proper corporate action—or a total of $285,800. Before 1917, the money borrowed from the Mercantile Trust Co. on the notes of the company was paid with cash advanced by the nine shareholders, each of whom contributed about $8,300 for that purpose. As consideration for such contributions, each of the nine stockholders received the note of the company in the amount of about $8,300, but all such notes were surrendered to the company and canceled, without any cash payments having been made thereon, prior to 1917. Assessments in the amount of $10,800 were paid in to the company by the shareholders during the year 1915.

In 1917, the nine original shareholders of the Mid-City Realty Co. sold all their stock to the Columbia Theatre Co., which, between that date and January 1, 1919, expended the amount of $63,874.56 for alterations and additions to the properties.

The Middleton Theatre Co. was incorporated, under the laws of Missouri, on June 13, 1899, with a paid-in capital of $25,000. On June 16, 1899, with the proceeds of its capital stock, it acquired the unexpired term of a lease on the Grand Opera House, terminating on July 1, 1912. As additional consideration for such lease, it agreed to pay and did pay $75 per week for 40 weeks in each of the four following years, and such payments, in the total amount of $12,000, were charged to profit and loss on its books of account. On October 31, 1910, it subleased the Grand Opera House to the St. Louis Theatre Co. for the remaining term of its lease on that building. On November 1, 1900, it purchased an underlying lease, expiring July 1, 1912, on the ground occupied by the Grand Opera House and certain adjacent buildings, from Pierre Chouteau, and paid therefor the amount of $62,500. By these purchases and payments, aggregating $99,500, it acquired the use and enjoyment of the land and buildings thereon until July 1, 1913, subject to the rights of certain persons who had subleases on portions of the premises.

In 1906, the Middleton Theatre Co. secured a renewal of the lease on the ground above described for a period of 99 years from July 1, 1912. For such 99-year lease, it paid a bonus of $10,000, in five annual payments of $2,000 each. Among other conditions of the lease, the lessee agreed to erect a hotel building, at a cost of not less than $40,000, and to remodel the Grand Opera House theatre building, at a cost of not less than $150,000. To enable it to enter into full possession of the leased premises and begin the building operations to which it was obligated by the terms of its 99-year lease, the taxpayer, some time in 1912, paid the St. Louis Theatre Co. $9,999 for the unexpired term of the sublease given to that concern on October 1, 1900.

Some time during the year 1912, the Middleton Theatre Co., in conformity with the terms of its 99-year lease, began building operations on the hotel and theatre buildings. For a period of nearly three years, while construction was in progress, there was little income from the property and, at the same time, in addition to amounts expended in construction, there were net payments, designated by the taxpayer as carrying charges, which the parties agree were as follows:

| | |
|---|---:|
| Ground rentals | $24, 594. 99 |
| Taxes | 11, 252. 40 |
| Attorneys' fees | 6, 350. 00 |
| Insurance | 5, 028. 59 |
| Interest on borrowed money used in construction | 39, 097. 38 |
| Sundry expenses from Nov. 1, 1910, to Dec. 31, 1913 | 9, 632. 23 |
| Sundry expenses in connection with contracts, 1913 | 7, 567. 01 |
| Total | 103, 522. 60 |

The remodeled Grand Opera House was opened for business in March, 1913; the American Annex Hotel, constructed by the Middleton Theatre Co. under the terms of its contract, was turned over to lessees in January, 1914. The balance sheet of the Middleton Theatre Co. as of December 31, 1914, showed an improvement account of $434,348.35, and an equipment account of $49,925.45, on a total property investment in the amount of $484,273.80. Its authorized capital stock in May, 1913, was $100,000 common and $150,000 preferred, and so remained to January 1, 1919. On December 31, 1914, the company owed money borrowed from St. Louis banks in the amount of $310,000.

From December 31, 1914, to December 31, 1918, the Middleton Theatre Co. used considerable amounts of its earnings to make payments on its loans, and at the latter date had reduced its obligations for borrowed money to the amount of $24,500 owed on notes to banks and $200,000 secured by mortgage on its properties. Its balance sheet as of December 31, 1918, was as follows:

*Balance sheet*

| | | | |
|---|---|---|---|
| Equipment | $52,553.10 | St. Louis Union Bank | $20,000.00 |
| Improvement | 445,485.48 | Common stock | 100,000.00 |
| Leasehold | 255,519.13 | Preferred stock | 150,000.00 |
| Columbia Theatre Co | 7,650.00 | St. L. Un. Bk. Fourth | |
| Fourth Liberty loan | 5,000.00 | Liberty loan | 4,500.00 |
| Vaudeville managers P. A. | 35.80 | War tax | 3,262.50 |
| Frank R. Tate | 600.00 | Lawton-Byrne-Bruner | 5,427.28 |
| Imperial Theatre Co | 2,600.00 | Mortgage account | 200,000.00 |
| Harry Wilson | 40.00 | Capital investment | 380,307.62 |
| Loan a/c Vaudeville Th | 167,540.30 | Reserve for depreciation | 112,436.45 |
| Southern R. E. & F. Co | 14,900.00 | | |
| Mercantile Trust Co | 16,703.03 | | |
| Change | 300.00 | | |
| Loss & gain | 2,148.03 | | |
| Balance | 4,858.98 | | |
| | 975,933.85 | | 975,933.85 |

Upon audit of the consolidated return made by the taxpayer for itself and affiliated corporations, the Commissioner reduced the invested capital of the group to $607,123.93, by disallowing certain amounts included by the taxpayer in the computation of the statutory invested capital of the Mid-City Realty Co. and the Middleton Theatre Co., and determined the deficiency in controversy.

DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be made on 15 days' notice, under Rule 50.

OPINION.

LANSDON: This appeal involves the correct determination of the statutory invested capital of a group of affiliated companies, which made a consolidated income and profits-tax return for the year 1919 through the taxpayer, which is the parent corporation. The questions involved must be resolved by ascertaining the correct invested capital of the Mid-City Realty Co. and the Middleton Theatre Co.

The Mid-City Realty Co. had capital paid in for shares in the amount of $100,000, concerning which there is no controversy. The taxpayer contends that the amounts of $75,000 loaned to the company by its stockholders, who received therefor the notes of the company which subsequently were voluntarily surrendered and canceled without any payments having been made thereon, and $10,800 paid in by the shareholders in response to assessments legally made by the directors, should also be included in the computation of its statutory invested capital, together with any earned surplus indicated by its books on January 1, 1919.

Each of the amounts in question was embarked in and at risk in the business. Except in the event of liquidation, none of the contributors had any legally enforceable claim against the company for any part of the principal amounts so paid in, or for dividends or interest thereon. Their only hope of repayment or profit was in the success of the company. If it earned substantial profits, they might receive dividends sufficiently large to pay them some return on their entire contributions. If it made enough profits, such dividends could be paid and the surplus resulting from the transactions now under consideration would continue to represent tangible property and be evidenced to the shareholders in the book value and market price of the shares of the company. From every point of view, it would seem that these amounts were actually embarked in the business and were at risk, in exactly the same way as the money originally paid in for shares.

It has been argued that corporate funds obtained as set forth in our findings of fact can not, from their very nature, become unchangeable capital items. Why not? The law provides that property paid in for shares of stock shall be included in the computation of invested capital for excess-profits tax purposes, even though such assets may thereafter entirely disappear. We have held above that, in the circumstances of this appeal, there is no inherent difference between the nature of paid-in surplus and of property paid in for shares. Together they make up the total capital contributions embarked in an enterprise and are entitled to a fair return before the provisions of the excess-profits tax law are applied, and therefore must be regarded as a single and inseparable body of statutory

invested capital. In this connection, the Board has recently held, in the *Appeal of Guarantee Construction Co.*, 2 B. T. A. 1145:

We are of the opinion, therefore, that capital and surplus actually paid in remain part of the invested capital of a corporate taxpayer, except where such capital or surplus has been directly or indirectly returned to the stockholders.

In the case at bar, there has been no such return, by distribution of dividends or otherwise. We are of the opinion that the payments here in question were contributions to capital, and, as they are not specifically excluded as inadmissibles under section 325 of the Revenue Act of 1918, they must be included in the taxpayer's statutory invested capital. *Lincoln Chemical Co.* v. *Edwards*, 289 Fed. 458; *Appeal of Guarantee Construction Co., supra*; *United States* v. *Oregon-Washington R. & Nav. Co.*, 251 Fed. 211.

The expenditure of $63,874.56 by the Columbia Theatre Co., for capital additions to the property of the Mid-City Realty Co., after it had become the owner of all the capital stock of such Mid-City Realty Co., which the taxpayer also seeks to have included in the consolidated invested capital of the affiliated group, must be regarded as an inter-company transaction. Before this money was so used, it was a part of the capital or surplus of the Columbia Theatre Co. Its investment in capital assets belonging to an affiliated company does not change its status. It is already included in the consolidated invested capital of the group.

The taxpayer also contends that the amount of $24,000 paid on the bonded debt of the Mid-City Realty Co., for the most part out of operating income, should be included in the computation of invested capital. Since the repayment of borrowed money out of profits results in the inclusion of the assets represented by such borrowed capital in the earned surplus of the company, the Board holds that this item is already included in the invested capital of the company, if the books of account properly reflect such transactions.

The Board is of the opinion that the statutory invested capital of the Mid-City Realty Co. for the year involved in this appeal was made up of the amounts of $100,000 paid in for shares of capital stock, $85,800 paid-in surplus, and such earned surplus as may be disclosed by the company's balance sheet as of December 31, 1918.

The taxpayer contends that certain expenditures and investments made by the Middleton Theatre Co. should be included in the consolidated invested capital of the affiliated companies. These expenditures fall into three groups: (1) Payments made to obtain the use and enjoyment of the unexpired term of a 30-year lease on the premises occupied by the Grand Opera House and the American Annex Hotel; (2) payments in the form of bonus and expenses, to

secure a 99-year lease on the same premises; and (3) certain so-called carrying charges, incurred during the period of construction of the hotel and reconstruction of the theatre.

The 30-year lease, which was acquired by the taxpayer at a cost of $99,500, expired on July 1, 1912. Its cost or value can not be regarded as an element of invested capital for the year 1919.

Although the 99-year lease on the same property is frequently designated by the witnesses of the taxpayer as the " 105 year lease," there is nothing in the evidence to indicate that it was anything more than a 99-year lease, which began to run on July 1, 1912. This lease was not offered in evidence. Any expenditures, in the way of cost or bonus, incurred in connection with its acquisition, should be capitalized and exhausted ratably over the 99-year period beginning July 1, 1912. The $10,000 bonus paid to secure this lease and the $9,999 paid to the St. Louis Theatre Co., in order that the lessee company might enter into full possession of the premises and begin its building operations in season to enable it to enjoy its 99-year lease for the full term thereof, are costs in connection with the acquisition of such lease, and should be included in the consolidated invested capital of the affiliated group.

During the period of its building operations, from 1910 to 1913, the taxpayer was without any substantial income from its property, and was required to make disbursements for ground rentals, taxes and other expenses incident to its ownership of the two leases and its improvement of the ground, as required by the terms of its contract with the owner of the fee. These payments, in the total amount of $103,522.60, the taxpayer seeks to have included in its invested capital. The Board is of the opinion that the amounts of $6,350 attorneys' fees, paid in connection with the acquisition of leases; $5,028.59, cost of insurance during building operations; and $5,067.01, sundry expenses in connection with contracts, are capital expenditures, and, to the extent that they are reflected in the surplus for the years in question, should be included in the statutory invested capital of the taxpayer. The remaining items, listed as carrying charges, appear to be ordinary and necessary expenses. *Westerfield* v. *Rafferty*, 4 Fed. (2d) 590; *Appeal of Hotel De France Co.*, 1 B. T. A. 28.

The Board is of the opinion that the following amounts, as the invested capital of the Middleton Theatre Co., should be included in the consolidated invested capital of the affiliated group: $250,000 paid in for common and preferred stock; $19,999 cost of securing 99-year lease and the earned surplus of the Middleton Theatre Co. as of December 31, 1918, with proper adjustment resulting from deducting accrued exhaustion of the 99-year leasehold from July 1, 1912, to December 31, 1918.